JUDGE BUCHWALD

# 11 CIV 5556

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

IRON WORKERS MID-SOUTH PENSION
FUND, Derivatively on Behalf of NEWS
CORPORATION,

                Plaintiff,

     v.

KEITH RUPERT MURDOCH, JAMES R.
MURDOCH, CHASE CAREY, DAVID F.
DEVOE, JOEL KLEIN, ARTHUR M. SISKIND,
LES HINTON, REBEKAH MARY BROOKS,
LACHLAN K. MURDOCH, ANDREW S. B.
KNIGHT, RODERICK I. EDDINGTON,
THOMAS J. PERKINS, PETER L. BARNES,
KENNETH E. COWLEY, VIET DINH, JOHN L.
THORNTON, JOSÉ MARÍA AZNAR, and
NATALIE BANCROFT,

                Defendants,

  -and-

NEWS CORPORATION, a Delaware corporation,

            Nominal Defendant.

------------------------------------------------------X

Case No.

( ECF CASE )

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, WASTE
OF CORPORATE ASSETS, UNJUST
ENRICHMENT, AND VIOLATION OF
THE SECURITIES EXCHANGE ACT OF
1934

AUG 10 2011
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant News Corporation ("News Corp" or the "Company") against certain of its current and former officers and directors.  This action seeks to remedy defendants' violations of federal securities law and state law, including breach of fiduciary duties, waste of corporate assets, and unjust enrichment.  These violations have caused and continue to cause substantial damage to the Company, including its reputation and goodwill.

2.      News Corp is currently mired in an explosive scandal that has rocked the news media industry, and has threatened the stability of the Company and its long-term goals.  In particular, the scandal involves News International Limited ("News International"), which is the United Kingdom ("UK") publishing division of the Company, and the unlawful and unscrupulous information-gathering methods employed by its now-defunct tabloid newspaper, *News of the World*.  Employees of *News of the World* hacked into the cell phones of thousands of people and intercepted their voicemails and messages in order to obtain information for potential publication.  Among those that were targeted in this "phone-hacking scandal" include British royalty, relatives of deceased British soldiers, celebrities, relatives of the victims of the July 7, 2005 London bombings, and a missing schoolgirl who was later found murdered.  Further, recent reports have alleged that News Corp employees tried to hack into the voicemails of 9/11 victims.  News Corp and its subsidiaries unlawful activities were not limited to phone-hacking either.  They also made illicit payments to British police officers in exchange for information.

3.      In the wake of the hacking scandal and allegations of bribing public officials, the Company has shut down *News of the World*, one of its longest tenured news outlets.  The scandal has also forced the Company to abandon its bid to acquire the remaining outstanding shares of British Sky Broadcasting plc ("BSkyB"), a leading UK satellite broadcasting company.  News Corp's acquisition of BSkyB was vital to the Company's long-term plan for its Sky broadcasting family.  Now, News Corp may even be forced to surrender its 39% stake in BSkyB amidst crippling pressure from the British House of Commons questioning whether the Company is "fit and proper" to operate the media company.

4.     Knowledge of the phone-hacking at *News of the World* reached the highest levels of the Company as demonstrated by the wave of resignations including, most notably, the departure of News International's Chief Executive Officer ("CEO"), defendant Rebekah Mary Brooks ("Brooks") and the CEO of Dow Jones & Company, Inc. ("Dow Jones"), defendant Les Hinton ("Hinton"). Brooks, along with two other former *News of the World* editors, were later arrested on suspicion of conspiring to intercept communications and corruption. Finally, defendant Keith Rupert Murdoch ("R. Murdoch"), News Corp's CEO and Chairman of the Board of Directors (the "Board"); and his son defendant James R. Murdoch ("J. Murdoch"), the Company's deputy Chief Operating Officer ("COO") and Chairman and CEO of the Company's international operations, were summoned to a hearing before Parliament to give evidence concerning their knowledge of the scandal, and their failure to detect or prevent such illicit practices.

5.     Although the Individual Defendants (as defined herein) feigned lack of awareness of the decade-long practice of phone-hacking and bribing of British police officers, these defendants were either well aware of the improper practices being perpetrated or, at the very least, turned a blind-eye to the wrongdoings. In particular, defendants Hinton and Brooks were at the helm of News International and *News of the World*, as the CEO and editor, respectively, when many of the egregious hacking incidences took place and corruption was rampant. Further, J. Murdoch personally approved settlements to other hacking victims in 2008. The Company allegedly conducted a "rigorous" internal investigation in 2007 when the hacking allegations first came to light. However, the investigation was all for show, as the Individual Defendants willfully ignored mountains of evidence that demonstrated the scandal was widespread and permeated throughout the culture of *News of the World* and News Corp. After conducting the flawed investigation, the Individual Defendants insisted that the hacking was isolated to a single incident involving a couple of "rogue" journalists. Ultimately, the Individual Defendants would not be able to maintain this façade, as evidence of other hacking targets and "hush money" paid to silence aggrieved hacking victims came to the public forefront. Incredibly, however, R. Murdoch maintains that he was ignorant to the magnitude of the hacking scandal and the

settlement payments made by the Company which were approved by his son, J. Murdoch, and the board of News Group Newspaper Ltd. ("News Group"), a subsidiary of News International.

6.    In short, the Individual Defendants breached their fiduciary duties by causing or allowing the Company, through its subsidiaries, to engage in the illegal business practices described herein.  The Individual Defendants failed to implement or maintain adequate internal controls to prevent violations of the applicable federal, state, and foreign laws and regulations, and endorsed a decade-long practice of "phone-hacking" and bribing public officials for information.  The Individual Defendants' conduct was especially egregious because, even after they undeniably knew of the illegal acts occurring at the Company, they engaged in a campaign of deception by making improper statements that concealed the widespread nature of News Corp and its subsidiaries' illicit practices.   Certain Individual Defendants also made improper statements in News Corp's public filings that failed disclose the material weaknesses infecting the Company's internal controls over the Company's public disclosures which allowed the Individual Defendants to hide the true extent of the misconduct.

7.    As a result of the Individual Defendants' misconduct, News Corp has incurred and continues to incur serious damages arising from the numerous civil and criminal legal proceedings and investigations commenced, and to be commenced, against the Company. Further, the Company has and will further incur additional damages including fines, penalties, and adverse changes to its business practices and operations, not to mention a devastating impact on its goodwill and reputation. The Company has already absorbed a significant blow, as it suffered a $3.7 billion loss in market capitalization, leading to an ensuing securities class action filed against it and its culpable officers and directors.  Further, as discussed above, the Company was forced to abandon its bid for BSkyB, which would have represented the largest acquisition in Company history.

8.    Plaintiff, on behalf of News Corp, seeks to recover for News Corp the damages caused to the Company by the Individual Defendants.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. section 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). This Court also has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. section 1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a) because: (i) News Corp maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to News Corp occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff Iron Workers Mid-South Pension Fund was a shareholder of News Corp at the time of the wrongs complained, has continuously been a shareholder since that time, and is

a current News Corp shareholder.  Plaintiff is a citizen of Louisiana, Mississippi, Oklahoma, and Texas.

13.    Nominal defendant News Corp is a Delaware corporation with principal executive offices located at 1211 Avenue of the Americas, New York, New York.  News Corp is a diversified global media company which manages and reports its business in six segments: Cable Network Programming, Filmed Entertainment, Television, Direct Broadcast Satellite Television, Publishing, and Other.  The activities of News Corp are conducted primarily in the United States, Continental Europe, the UK, Australia, Asia, and Latin America.

14.    Defendant R. Murdoch is News Corp's CEO and a director and has been since 1979.  R. Murdoch is also News Corp's Chairman of the Board and has been since 1991.  R. Murdoch was a director of News International, News Corp's principal and wholly owned subsidiary in the UK, from 1969 to at least December 2006.  R. Murdoch was also Chairman of BSkyB, a leading pay television broadcast service company in which News Corp holds a significant stake, from 1999 to December 2007; and a director from 1990 to December 2007.  R. Murdoch is the father of J. Murdoch and defendant Lachlan K. Murdoch ("L. Murdoch").  R. Murdoch knowingly, recklessly, or with gross negligence: (i) caused or allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) made or allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements in the Company's public filings, including News Corp's annual and interim reports and definitive proxies that failed to disclose that the Company lacked an effective system of internal controls over financial reporting and to detect or prevent the illicit activities.  R. Murdoch is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. News Corp paid R. Murdoch the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2010 | $8,100,000 | - | · | $4,050,000 | $4,368,800 | $5,910,000 | $296,475 | $22,725,275 |
| 2009 | $8,100,000 | - | · | $4,050,000 | $5,435,000 | $4,237,000 | $379,981 | $22,201,981 |
| 2008 | $8,100,000 | · | · | $4,050,000 | $17,500,000 | - | $403,169 | $30,053,169 |
| 2007 | $8,100,000 | - | · | $1,012,500 | $15,795,000 | $8,672,000 | $356,175 | $32,135,675 |
| 2006 | $4,508,694 | $21,175,000 | $218,645 | - | · | - | $8,600 | $25,908,939 |
| 2005 | $4,508,725 | $18,890,000 | $230,921 | - | - | - | $6,300 | $23,635,946 |
| 2004 | $4,509,000 | $12,500,000 | $211,322 | - | - | - | $8,150 | $17,226,472 |
| 2003 | $4,508,000 | $7,500,000 | $146,459 | · | - | - | $8,000 | $12,160,459 |
| 2002 | $4,357,000 | $3,000,000 | $1,849,000 | · | - | · | · | $9,206,000 |

R. Murdoch is a citizen of New York.

15.     Defendant J. Murdoch is News Corp's Deputy COO and Chairman and CEO of the Company's international operations and has been since March 2011. J. Murdoch is also a News Corp director and has been since December 2007. J. Murdoch has direct responsibility for News Corp's operations in Europe and Asia, reports to defendant Carey, and works closely with defendant R. Murdoch. J. Murdoch was also News Corp's Chairman and CEO of Europe and Asia operations from December 2007 to March 2011, at which time he had direct responsibility for the strategic and operational development of News Corp's television, newspaper, and related digital assets in Europe, Asia, and the Middle East. J. Murdoch was also a News Corp director from 2000 to November 2003. J. Murdoch has served in various other capacities at News Corp since joining the Company in 1996, including as Executive Vice President and a member of the Office of the Chairman. J. Murdoch is also BSkyB's Chairman of the Board and has been since December 2007 and a director and has been since February 2003. J. Murdoch was BSkyB's CEO from November 2003 to December 2007. J. Murdoch is the son of defendant R. Murdoch and the brother of defendant L. Murdoch. J. Murdoch knowingly, recklessly, or with gross negligence: (i) caused or allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) made improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements in the Company's public filings, including the News Corp's annual and interim reports and definitive

proxies that failed to disclose that the Company lacked an effective system of internal controls over financial reporting and to detect or prevent the illicit activities.   J. Murdoch is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   News Corp paid J. Murdoch the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensa- tion | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensa- tion | Change in Pension Value | All Other Compensa- tion | Number of Options Granted | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $3,192,571 | $1,700,000 | - | $1,583,412 | - | $2,184,400 | $1,454,000 | $181,598 | - | $10,296,081 |
| 2009 | $3,147,236 | $1,573,618 | - | $2,491,709 | - | $2,717,500 | $167,000 | $219,538 | - | $10,316,501 |
| 2008 | $1,895,200 | $1,421,400 | - | $7,804,000 | - | $3,572,917 | $2,381,000 | $54,175 | - | $17,128,692 |
| 2002 | $735,000 | $500,000 | $10,000 | - | $415,000 | - | - | - | 180,000 | $1,660,000 |

J. Murdoch is a citizen of the UK.

16.     Defendant Chase Carey ("Carey") is News Corp's President, COO, Deputy Chairman of the Board, and a director and has been since July 2009.   Carey was also a consultant to News Corp from 2002 to 2003; Co-COO from 1996 to January 2002; and a director from 1996 to December 2007.   Carey joined News Corp in 1988.   Carey was a BSkyB director from February 2003 to February 2009.   Carey knowingly, recklessly, or with gross negligence: (i) caused or allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv)  made improper statements in the Company's public filings, including the News Corp's annual and interim reports and definitive proxies that failed to disclose that the Company lacked an effective system of internal controls over financial reporting and to detect or prevent the illicit activities.   Carey reports to defendant R. Murdoch.   News Corp paid Carey the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Option Awards | Change in Pension Value | All Other Compensation | Number of Options Granted | Total |
|---|---|---|---|---|---|---|---|---|
| 2010 | $8,100,000 | $15,000,000 | - | | $2,906,000 | $32,482 | - | $26,038,482 |
| 2002 | $1,622,000 | $3,000,000 | $5,486,000 | $674,000 | - | - | 260,000 | $10,782,000 |

As a director:

| Fiscal Year 2007 | Change In Pension Value | Total |
|---|---|---|
| | $961,000 | $961,000 |

Carey is a citizen of Connecticut.

17.    Defendant David F. DeVoe ("DeVoe") is News Corp's Chief Financial Officer ("CFO") and a director and has been since 1990. DeVoe is also News Corp's Senior Executive Vice President and has been since 1996. DeVoe is a BSkyB director and has been since 1994. DeVoe knowingly, recklessly, or with gross negligence: (i) caused or allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) made or allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements in the Company's public filings, including the News Corp's annual and interim reports and definitive proxies that failed to disclose that the Company lacked an effective system of internal controls over financial reporting and to detect or prevent the illicit activities. News Corp paid DeVoe the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change In Pension Value | All Other Compensation | Number of Options Granted | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $2,853,750 | - | - | $1,429,875 | - | $2,000,000 | $861,000 | $187,804 | - | $7,129,429 |
| 2009 | $2,853,750 | - | - | $2,693,824 | - | $2,174,000 | $783,000 | $165,128 | - | $8,669,702 |
| 2008 | $2,853,750 | - | - | $2,522,571 | - | $4,250,000 | - | $212,603 | - | $9,838,924 |
| 2007 | $2,853,750 | - | - | $3,230,640 | $622,697 | $4,079,500 | $790,000 | $153,313 | - | $11,729,900 |
| 2006 | $2,603,750 | $8,235,000 | $154,240 | $3,742,635 | - | - | - | $6,600 | - | $12,742,225 |
| 2005 | $2,603,750 | $5,778,000 | - | - | - | - | - | $5,300 | 250,000 | $8,388,050 |
| 2004 | $2,292,000 | $2,350,000 | - | - | - | - | - | $6,150 | 250,000 | $4,648,150 |
| 2003 | $2,104,000 | $7,150,000 | - | - | - | - | - | $6,000 | 240,000 | $9,260,000 |
| 2002 | $1,754,000 | $2,000,000 | $315,000 | - | $674,000 | - | - | - | 260,000 | $4,743,000 |

DeVoe is a citizen of New York.

18.      Defendant Joel Klein ("Klein") is News Corp's Executive Vice President and a director and has been since January 2011. Klein is also the CEO of News Corp's education division and has been since January 2011. Klein reports to defendant R. Murdoch and acts as a senior advisor to R. Murdoch on a wide range of initiatives including developing business strategies for the emerging education marketplace. Klein knowingly, recklessly, or with gross negligence: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; and (iii) made or allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities. Klein is a citizen of New York.

19.      Defendant Arthur M. Siskind ("Siskind") is a News Corp director and has been since 1991 and the Senior Advisor to News Corp's Chairman of the Board and has been since January 2005. Siskind was also News Corp's Group General Counsel from 1991 to January 2005; Senior Executive Vice President from 1996 to January 2005; and Executive Vice President from 1991 to 1996. Siskind is a BSkyB director and has been since 1991. Siskind knowingly, recklessly, or with gross negligence: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements in the Company's public filings, including the News Corp's annual and interim reports and definitive proxies that failed to disclose that the Company lacked an effective system of internal controls over financial reporting and to detect or prevent the illicit activities. News Corp paid Siskind the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Option Awards | All Other Compensation | Number of Options Granted | Total |
|---|---|---|---|---|---|---|---|
| 2005 | $1,715,427 | $5,000,000 | - | - | $6,300 | 250,000 | $6,721,727 |
| 2004 | $2,142,000 | $1,300,000 | - | - | $6,150 | 250,000 | $3,448,150 |
| 2003 | $1,959,000 | $1,200,000 | - | - | $6,000 | 240,000 | $3,165,000 |
| 2002 | $1,725,000 | $1,000,000 | $510,000 | $674,000 | - | 260,000 | $3,909,000 |

As a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $1,200,000 | $1,200,000 | - | $1,170,000 | $146,365 | $3,716,365 |
| 2009 | $1,093,846 | $476,443 | - | $620,000 | $150,015 | $2,340,304 |
| 2008 | $1,000,000 | $1,485,072 | - | - | $143,977 | $2,629,049 |
| 2007 | $1,000,000 | $1,600,588 | $622,698 | $417,000 | $140,397 | $3,780,683 |

Siskind is a citizen of New York.

20.     Defendant Hinton was CEO of Dow Jones, a publishing subsidiary of News Corp, from December 2007 to July 2011. Les Hinton was also Executive Chairman of News International, where he oversaw the publication of national newspapers such as *The Times*, *The Sunday Times*, *The Sun*, *News of the World*, *The Times Literary Supplement*, and *thelondonpaper*, from 1995 to December 2007. Hinton also served in various other capacities at News Corp's publishing and television business units during his fifty-two year tenure at the Company, including as Publisher of *The Wall Street Journal* and a correspondent for News Corp's newspapers in the UK and Australia. Hinton knowingly, recklessly, or with gross negligence caused News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for newsworthy information, and failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations. Hinton knowingly, recklessly, or with gross negligence made improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities. Hinton is a citizen of New York.

21.     Defendant Brooks was the CEO of News International, where she reported to J. Murdoch and had responsibility over the publication of *The Times*, *The Sunday Times*, *News of The World*, *The Sun*, and *thelondonpaper*, from September 2009 to July 2011. Brooks was also Editor of News Corp's British newspaper, *The Sun*, from January 2003 to September 2009; and

Editor of News Corp's *News of the World* from May 2000 to January 2003. Brooks also served in various capacities at News Corp and its subsidiaries since joining the Company in 1989, including as Deputy Editor of *The Sun*. Brooks knowingly, recklessly, or with gross negligence caused News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for newsworthy information, and failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations. Brooks knowingly, recklessly, or with gross negligence made improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities. Brooks is named as a defendant in a securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Brooks is a citizen of the UK.

22.     Defendant L. Murdoch is a News Corp director and has been since 1996. L. Murdoch was also an advisor to News Corp from August 2005 to 2007 and News Corp's Deputy COO from 2000 to August 2005. L. Murdoch has served in various other capacities since joining News Corp in 1994, including as Publisher of *The New York Post*. L. Murdoch is the son of defendant R. Murdoch and the brother of defendant J. Murdoch. L. Murdoch knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. L. Murdoch also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid L. Murdoch the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Option Awards | All Other Compensation | Number of Options Granted | Total |
|---|---|---|---|---|---|---|---|
| 2005 | $2,000,000 | $5,778,000 | - | - | $6,300 | 187,500 | $7,784,300 |
| 2004 | $1,800,000 | $2,000,000 | - | - | $6,150 | 187,500 | $3,806,150 |
| 2003 | $1,403,000 | $1,200,000 | - | - | $6,000 | 170,000 | $2,609,000 |
| 2002 | $1,313,000 | $700,000 | $137,000 | $674,000 | - | 260,000 | $2,824,000 |

As a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $100,000 | $120,000 | - | $1,571,000 | - | $1,791,000 |
| 2009 | $100,000 | - | - | $231,000 | - | $331,000 |
| 2008 | $90,000 | - | - | - | $48,830 | $138,830 |
| 2007 | $85,000 | $469,873 | $356,625 | $422,000 | $29,638 | $1,363,136 |
| 2006 | $70,833 | $70,833 | - | - | - | $141,666 |

L. Murdoch is a citizen of Australia.

23.     Defendant Andrew S. B. Knight ("Knight") is a News Corp director and has been since 1991. Knight was also Chairman of News International from 1990 to 1995. Knight is a member of News Corp's Audit Committee and has been since at least December 2002. Knight knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Knight also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Knight the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $161,960 | $120,000 | - | $281,960 |
| 2009 | $162,141 | - | - | $162,141 |
| 2008 | $157,038 | - | - | $157,038 |
| 2007 | $148,175 | $123,142 | $1,943 | $273,260 |
| 2006 | $247,181 | $85,000 | - | $332,181 |
| 2005 | $111,000 | $40,000 | - | $151,000 |
| 2004 | $170,000 | - | $6,000 | $176,000 |
| 2003 | $83,000 | - | $6,000 | $89,000 |
| 2002 | $54,000 | - | $30,000 | $84,000 |

Knight is a citizen of the UK.

24.     Defendant Roderick I. Eddington ("Eddington ") is News Corp's Lead Director and has been since at least September 2006 and a director and has been since 1999. Eddington is also Chairman of News Corp's Audit Committee and has been since June 2004. Eddington was a member of News Corp's Nominating and Corporate Governance Committee from at least December 2002 to June 2004. Eddington knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Eddington also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Eddington the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $154,000 | $120,000 | - | $274,000 |
| 2009 | $154,000 | - | - | $154,000 |
| 2008 | $144,000 | - | - | $144,000 |
| 2007 | $135,000 | $123,142 | $1,943 | $260,085 |
| 2006 | $235,000 | $85,000 | - | $320,000 |
| 2005 | $116,000 | $40,000 | - | $156,000 |
| 2004 | $137,000 | - | $6,000 | $143,000 |
| 2003 | $53,000 | - | $6,000 | $59,000 |
| 2002 | $35,000 | - | $30,000 | $65,000 |

Eddington is a citizen of Australia.

25.    Defendant Thomas J. Perkins ("Perkins") is a News Corp director and has been since 1996. Perkins is also a member of News Corp's Audit Committee and has been since at least December 2002, and a member of the Nominating and Corporate Governance Committee and has been since August 2007. Perkins knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Perkins also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Perkins the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $138,000 | $120,000 | - | $258,000 |
| 2009 | $138,000 | - | - | $138,000 |
| 2008 | $126,961 | - | - | $126,961 |
| 2007 | $110,000 | $123,142 | $1,943 | $235,085 |
| 2006 | $210,000 | $85,000 | - | $295,000 |
| 2005 | $100,000 | $40,000 | - | $140,000 |
| 2004 | $146,000 | - | $6,000 | $152,000 |
| 2003 | $61,000 | - | $6,000 | $67,000 |
| 2002 | $39,000 | - | $30,000 | $69,000 |

Perkins is a citizen of California.

26.     Defendant Peter L. Barnes ("Barnes") is a News Corp director and has been since April 2004.  Barnes is also a member of News Corp's Audit Committee and has been since June 2004.  Barnes knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Barnes also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls.  News Corp paid Barnes the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Change In Pension Value | Total |
|---|---|---|---|---|
| 2010 | $116,000 | $120,000 | - | $236,000 |
| 2009 | $116,000 | - | - | $116,000 |
| 2008 | $106,000 | $5,315 | - | $111,315 |
| 2007 | $100,000 | $118,145 | - | $218,145 |
| 2006 | $100,000 | $85,000 | - | $185,000 |
| 2005 | $100,000 | $40,000 | - | $140,000 |
| 2004 | $29,000 | - | $2,000 | $31,000 |

Barnes is a citizen of Australia.

27.     Defendant Kenneth E. Cowley ("Cowley") is a News Corp director and has been since 1979.  Cowley is also a member of News Corp's Nominating and Corporate Governance Committee and has been since at least December 2002.  Cowley knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that

failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Cowley also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Cowley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $111,000 | $120,000 | - | - | $231,000 |
| 2009 | $111,000 | - | - | - | $111,000 |
| 2008 | $101,000 | - | - | - | $101,000 |
| 2007 | $95,000 | $123,142 | $1,943 | - | $220,085 |
| 2006 | $195,000 | $85,000 | - | - | $280,000 |
| 2005 | $91,000 | $40,000 | - | - | $131,000 |
| 2004 | $131,000 | - | $6,000 | - | $137,000 |
| 2003 | $53,000 | - | $6,000 | - | $59,000 |
| 2002 | - | - | $30,000 | $30,000 | $60,000 |

Cowley is a citizen of Australia.

28.    Defendant Viet Dinh ("Dinh") is a News Corp director and has been since April 2004. Dinh is also Chairman of News Corp's Nominating and Corporate Governance Committee and has been since at least September 2005, and a member of that committee and has been since June 2004. Dinh knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Dinh also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Dinh the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $138,000 | $120,000 | $258,000 |
| 2009 | $138,000 | - | $138,000 |
| 2008 | $126,961 | $5,315 | $132,276 |
| 2007 | $110,000 | $118,145 | $228,145 |
| 2006 | $110,000 | $85,000 | $195,000 |
| 2005 | $96,000 | $40,000 | $136,000 |
| 2004 | $26,000 | - | $26,000 |

Dinh is a citizen of Washington, D.C.

29.     Defendant John L. Thornton ("Thornton") is a News Corp director and has been since June 2004. Thornton is also a member of News Corp's Nominating and Corporate Governance Committee and has been since at least September 2005. Thornton was a BSkyB director from 1994 to May 2004. Thornton knowingly or recklessly: (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Thornton also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Thornton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $122,000 | $120,000 | $242,000 |
| 2009 | $122,000 | - | $122,000 |
| 2008 | $112,000 | $5,315 | $117,315 |
| 2007 | $105,000 | $118,145 | $223,145 |
| 2006 | $105,000 | $85,000 | $190,000 |
| 2005 | $97,000 | $40,000 | $137,000 |

Thornton is a citizen of Florida.

30.     Defendant José María Aznar ("Aznar") is a News Corp director and has been since June 2006. Aznar knowingly or recklessly (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making

unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Aznar also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Aznar the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $100,000 | $120,000 | $220,000 |
| 2009 | $100,000 | $46,161 | $146,161 |
| 2008 | $90,000 | $50,147 | $140,147 |
| 2007 | $85,000 | $102,402 | $187,402 |

Aznar is a citizen of Spain.

31. Defendant Natalie Bancroft ("Bancroft") is a News Corp director and has been since December 2007. Bancroft knowingly or recklessly (i) allowed News Corp and its subsidiaries to engage in illicit business practices which included intercepting voicemail messages and making unlawful payments to public officials for information; (ii) failed to implement and maintain adequate internal controls to detect or prevent the foregoing illicit news-gathering practices and ensure compliance with applicable rules and regulations; (iii) allowed the Company to make improper statements that concealed the true extent of News Corp and its subsidiaries' illicit activities; and (iv) made improper statements that failed to disclose that the Company lacked an effective system of internal controls to detect or prevent the illicit activities. Bancroft also knowingly, recklessly, or with gross negligence made improper statements in News Corp's definitive proxies that failed to disclose that the Company lacked an effective system of internal controls. News Corp paid Bancroft the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $100,000 | $120,000 | $220,000 |
| 2009 | $100,000 | $90,262 | $190,262 |
| 2008 | $49,500 | $44,971 | $94,471 |

Bancroft is a citizen of the UK.

32.    The defendants identified in ¶¶23-26 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶14-31 are referred to herein as the "Individual Defendants."

## DUTIES OF NEWS CORP'S DIRECTORS AND OFFICERS

**Fiduciary Duties**

33.    By reason of their positions as officers, directors, and/or fiduciaries of News Corp and because of their ability to control the business and corporate affairs of News Corp, the Individual Defendants owed News Corp fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage News Corp in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of News Corp so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

34.    Each officer and director of the Company owes to News Corp the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Standards of Business Conduct**

35.    Since at least December 2003, the Company had in place its Standards of Business Conduct ("SBC") which "set forth the general principles that underlie the culture of trust that is at the heart of [News Corp] and its majority-owned business units." The SBC is applicable to the Company's "directors, officers and employees" who "must act according to the principles set forth in [the SBC]." According to the SBC, News Corp's officers and directors were responsible for protecting the Company's "most valuable asset" – its reputation. In so doing, the SBC required that News Corp's officers and directors refrain from doing "anything that would harm that reputation, or that would otherwise bring the Company into disrepute."

- 19 -

Under the SBC, News Corp's officers and directors may not "offer, give, solicit or accept bribes or kickbacks, either in cash or in the form of any other thing or service of value." In addition, the SBC mandates compliance with the Foreign Corrupt Practices Act by all of its employees, and expressly prohibits bribery of foreign government officials and violation of other anti-corruption laws. In short, the SBC requires that each employee, including officers and directors, "conduct himself or herself with integrity."

**Specific Audit Committee Duties**

36.    In addition to their general duties, defendants Barnes, Eddington, Knight, and Perkins owe or owed specific duties as members of the Audit Committee, under the Audit Committee's Charter, to News Corp. In particular, under the Audit Committee Charter in effect since at least 2004, and amended in 2010, these Audit Committee Defendants were responsible for overseeing the "integrity of the Company's financial statements and the Company's financial reporting processes and systems of internal control." The Audit Committee met eight times during fiscal year 2005, six times during fiscal year 2006, six times during fiscal year 2007, six times during fiscal year 2008, seven times during fiscal year 2009, and six times during fiscal year 2010.

**Control, Access, and Authority**

37.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of News Corp, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

38.    Because of their advisory, executive, managerial, and directorial positions with News Corp, each of the Individual Defendants had access to adverse, non-public information about the financial condition and operations of News Corp.

39.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of News Corp, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

40.    To discharge their duties, the officers and directors of News Corp were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of News Corp were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business legally possible;

(c)    remain informed as to how News Corp, including its subsidiaries, conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

(d)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breach of Duties**

41.    Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of News Corp, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of News Corp's Board.

42.   The Individual Defendants breached their duties of loyalty and good faith by operating News Corp without implementing and maintaining internal controls to ensure compliance with the applicable federal, state, and foreign rules and regulations, and allowing the Company to engage in improper business practices that have tarnished the Company's reputation. These Individual Defendants made improper statements that concealed the widespread nature of the illicit practices.   As a result, News Corp has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the misconduct alleged herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Individual Defendants caused the Company to systematically violate applicable federal and foreign anti-bribery and anti-corruption regulations; (ii) deceive the investing public, including shareholders of News Corp, regarding the Individual Defendants' improper business practices; and (iii) enhance the Individual Defendants' executive and directorial positions at News Corp and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to engage in unlawful practices in breach of applicable privacy laws, and violate applicable anti-bribery and anti-corruption regulations.

46.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

47.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate applicable federal, state, and foreign laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

A.    **News Corp and Its Subsidiaries' Improper Business Practices**

    1.    **News Corp's Unscrupulous News-Gathering Methods**

49.    The first faint strands of the unlawful phone-hacking activities at News Corp emerged in November 2005 when *News of the World* published an article by royal editor Clive Goodman ("Goodman") concerning Prince William.  The article raised suspicion by the British royal family because it contained information to which few were privy.  The royal family suspected that it was likely that their voicemails were being accessed without their authorization, and they alerted British police who commenced an investigation into the matter.  Pursuant to an investigation that included searching through the London office of the *News of the World*, the police concluded that there was evidence indicating that the publication intercepted voicemails of countless individuals including members of Parliament, media figures, sports figures, and other

celebrities.    Yet, none of this information was released to the public and only a few of the targeted victims were notified of the potential breaches of privacy.

50.    On August 8, 2006, British police arrested Goodman and Glenn Mulcaire ("Mulcaire"), a private investigator who was paid by *News of the World* to hack into voicemail accounts and obtain information for the periodical.  Goodman and Mulcaire were charged with hacking the telephones of members of the royal family by accessing voicemail accounts.  On January 26, 2007, they plead guilty to the charges and were sentenced to four and six month's imprisonment, respectively.  That same day, Andy Coulson ("Coulson"), the then-editor of *News of the World* resigned from his post.  In public statements corresponding to his resignation, Coulson denied any knowledge as to the phone-hacking activities at *News of the World* during his tenure.

51.    Despite the fact that two of its employees from *News of The World* were convicted of unlawfully intercepting voicemail messages, the Individual Defendants maintained their ignorance over the phone-hacking practices, and insisted that the illicit activities were an isolated incident and attributed to a single rogue reporter.  In March 2007, Hinton, News International's then-executive director, testified before Parliament claiming that *News of the World* had conducted "a full, rigorous internal inquiry," and that he was absolutely convinced that Goodman acted alone in perpetrating the hacking scandal.  He also denied any awareness on the part of Coulson, stating that he believed "absolutely that Andy did not have knowledge of what was going on."  In the same hearing, Coulson unequivocally disclaimed any knowledge as to the phone-hacking, testifying "I have never condoned the use of phone-hacking, and nor do I have any recollection of incidences where phone-hacking took place."  In September 2009, when Hinton was, again, summoned to give testimony before Parliament, he testified, "there was never any evidence delivered to me suggesting that the conduct of Clive Goodman spread beyond him."

### 2.    News Corp and Its Subsidiaries Attempt to Conceal Their Misconduct

52.    Notwithstanding their feigned ignorance, the Individual Defendants were well aware that the hacking scandal was more widespread than they had represented to the public and

Parliament. Although the British police had ample evidence of numerous other targeted victims of the phone-hacking scandal, they only notified five individuals that their phone communications may have been intercepted. Two of the five that there notified were Gordon Taylor ("Taylor"), chairman of the Profession Footballers' Association, and renown publicist Max Clifford ("Clifford").

53.    In an effort to conceal the broad-reaching scope of the phone-hacking, and the falsity of their statements to Parliament and the public-at-large, J. Murdoch and other executives at News International and *News of the World* authorized "hush" payments made to victims and the central characters involved in the scandal as early as 2008. Taylor was the first targeted victim to bring suit. In April 2008, Taylor obtained documents from a police investigation of Goodman and Mulcaire, among which were transcripts of Taylor's voicemails typed up by a junior reporter at *News of the World*. The transcript was marked "for Neville," presumably referring to Neville Thurlbeck, *News of the World's* Chief Reporter, who was the only employee by the name of Neville at the newspaper at the time. This revelation directly contradicted the Company's stance that the phone-hacking did not extend beyond the actions of Goodman and Mulcaire. According to Tom Crone ("Crone"), News International's legal manager at the time, this was when the Company sought to arrange an out-of-court settlement. Ultimately, News International paid over $1.1 million to Taylor to resolve claims that *News of the World* employees hacked into his voicemail account. The settlement with Taylor contained a "gag provision" preventing Taylor from publicly disclosing any information regarding the case. The directors of News Group expressly signed off on the settlement with Taylor. Defendant J. Murdoch also knew of Taylor's breach of privacy claims and authorized the payments made to him, as revealed in *The Guardian* report issued on July 21, 2009:

James Murdoch, the News International executive chairman, was aware of Gordon Taylor's breach of privacy claim and agreed with the decision to settle for £700,000 after a private investigator working for the News of the World hacked into the Professional Footballers' Association chief executive's phone, MPs were told today.

The News International head of legal, Tom Crone, and the News of the World editor, Colin Myler, took the settlement figure to Murdoch for his approval, MPs

on the Commons culture, media and sport select committee hearing into privacy, press standards and libel heard.

Myler told the committee that Crone – who was also giving evidence to MPs today – advised him after taking legal advice that News International should settle the case brought by Taylor, whose phone messages were hacked into by private investigator Glenn Mulcaire.

Mulcaire was sent to prison for six months in January 2007 for hacking into the messages of Taylor and other public figures, including Elle Macpherson, and members of the royal household.

Murdoch, also the chairman and chief executive of News International parent company News Corporation's businesses in Europe and Asia, was told about the Taylor claim, and Crone continued negotiations with the PFA boss until a settlement was agreed last year, Myler told the committee.

*"James Murdoch was apprised of the situation and agreed with our recommendation to settle," Myler said. "It was an agreed collective decision."*

54.    The Company's efforts to pin the blame on Goodman and Mulcaire by portraying the scandal as a construct of a few wayward reporters would only provide a brief reprieve for News Corp and its embattled British news division, News International.  On July 8, 2009, *The Guardian* published a story exposing the widespread nature of the phone-hacking scandal.  In particular, *The Guardian* revealed that *News of the World* had used private investigators to hack into several thousand cell phone accounts, including prominent figures such as former Deputy Prime Minister John Prescott, Former Secretary of State for Media Tessa Jowells, and soccer manager Sir Alex Ferguson.  A range of staff members at *News of the World*, including Coulson knew of these illicit practices.  As the report provided in detail, "reporters and executives ... commission[ed] multiple purchases of confidential information [from private investigators who engaged in illegal phone-hacking]," and these payments were "openly paid for by the accounts department with invoices which itemized illegal acts."  The Company's out-of-court settlements to induce silence from other victims were also uncovered, as it was reported News International paid out more than $1.6 million to settle legal cases with "gag provisions" that threatened to expose its misconduct.

55.    Despite the incontrovertible evidence to the contrary, News International continued to deny any other employees at *News of the World* were involved in the hacking

scandal aside from the Taylor case, and the Goodman and Mulcaire royal family incident. On July 10, 2009, News International issued a public statement responding to *The Guardian* report, and further maintained that there was no "systemic corporate illegality" to suppress evidence. Further, News International denied both that *News of the World* executives "knowingly sanctioned" payments to illegally hack into phones, and that police found evidence of staff hacking into thousands of mobile phones:

> From our own investigation, but more importantly that of the police, we can state with confidence that, apart from the matters referred to above, there is not and never has been evidence to support allegations that:
>
> - News of the World journalists have accessed the voicemails of any individual.
>
> - News of the World or its journalists have instructed private investigators or other third parties to access the voicemails of any individuals.
>
> - There was systemic corporate illegality by News International to suppress evidence.
>
> It goes without saying that had the police uncovered such evidence, charges would have been brought against other News of the World personnel. Not only have there been no such charges, but the police have not considered it necessary to arrest or question any other member of News of the World staff.
>
> Based on the above, we can state categorically in relation to the following allegations which have been made primarily by the Guardian and widely reported as fact by Sky News, BBC, ITN and others this week:
>
> It is untrue that officers found evidence of News Group staff, either themselves or using private investigators, hacking into "thousands" of mobile phones.
>
> It is untrue that apart from Goodman, officers found evidence that other members of News Group staff hacked into mobile phones or accessed individuals' voicemails.
>
> It is untrue that there is evidence that News Group reporters, or indeed anyone, hacked into the telephone voicemails of John Prescott.
>
> It is untrue that "Murdoch journalists" used private investigators to illegally hack into the mobile phone messages of numerous public figures to gain unlawful access to confidential personal data, including: tax records, social security files, bank statements and itemised phone bills.

It is untrue that News Group reporters have hacked into telephone voicemail services of various footballers, politicians and celebrities named in reports this week.

It is untrue that News of the World executives knowingly sanctioned payment for illegal phone intercepts.

All of these irresponsible and unsubstantiated allegations against News of the World and other News International titles and its journalists are false.

56.    While continuously denying reports of widespread improprieties, *News of the World* agreed to an out-of-court settlement with publicist Clifford worth roughly $1.5 million to settle a breach of privacy lawsuit against it concerning the phone-hacking scandal. The settlement agreement was critical to keep the Individual Defendants' misconduct under wraps because Clifford had just previously won a judicial order in his lawsuit compelling Mulcaire to identify the journalist who commissioned him to hack into Clifford's phone. Mulcaire's testimony would have revealed the widespread nature of the hacking scandal, and exposed the Individual Defendants' "rogue reporter" defense to be a complete fabrication.

57.    The Company also agreed to make out-of-court payments to Goodman and Mulcaire (over $130,000) in July 2007 to purportedly settle unfair dismissal claims. The settlement agreement was inexplicable considering Goodman and Mulcaire's guilty admissions and subsequent imprisonment for criminal misconduct that rightfully warranted their dismissal. It was later revealed that the Company paid for Goodman and Mulcaire's legal expenses during the relevant periods, further reinforcing the notion that the legal settlement and legal fees paid out by the Company were nothing more than bribe payments made to buy Goodman and Mulcaire's silence.

### 3.    News Corp and Its Subsidiaries Continue to Face Scrutiny as the Allegations Mount

58.    The newfound evidence of widespread misconduct and undisclosed out-of-court payments unleashed another wave of media speculation and investigations into the Company. In February 2010, the British House of Commons, Select Committee on Culture, Media and Sport ("CMS Committee"), issued a scathing report criticizing News International's handling of the phone-hacking scandal. The CMS Committee stated that the Company had "collective amnesia"

concerning the hacking scandal involving its subsidiary, and repudiated the "unwillingness to provide the detailed information that [the CMS Committee] sought, claims of ignorance or lack or recall, and deliberate obfuscation," by News International. The CMS Committee stated that News International's refusal to cooperate with the CMS Committee "reinforced the widely held impression that ... News International in particular has sought to conceal the truth."

59. On September 1, 2010, *The New York Times* published an article largely confirming earlier reports by *The Guardian* that the 2006 investigation into the royal family phone-hackings turned up evidence of large-scale phone-hacking practices at *News of the World*. The 2006 investigation uncovered files containing several thousand mobile phone numbers of potential phone-hacking victims and ninety-one mobile phone PIN codes used to access personal voicemails of the victims.

60. The Individual Defendants knew of the phone-hacking practices and other illicit activities that were rampant at News International's newspapers. As noted in *The New York Times* report, "more than a dozen former reporters and editors at *News of the World*" claimed that phone-hacking was pervasive and "everyone knew." "Everyone" included Coulson, who "was present during discussion about phone-hacking." At some of the meetings where Coulson would inquire about the source of a story, his editors would reply "[w]e've pulled the phone records" or "I've listened to the phone messages." In fact, a former reporter and onetime close friend of Coulson's disclosed that he "actively encouraged" phone-hacking tactics to obtain stories:

> One former editor said Coulson talked freely with colleagues about the dark arts, including hacking. "I've been to dozens if not hundreds of meetings with Andy" when the subject came up, said the former editor, who spoke on condition of anonymity. The editor added that when Coulson would ask where a story came from, editors would reply, "We've pulled the phone records" or "I've listened to the phone messages."

> Sean Hoare, a former reporter and onetime close friend of Coulson's, also recalled discussing hacking. The two men first worked together at The Sun, where, Hoare said, he played tape recordings of hacked messages for Coulson. At News of the World, Hoare said he continued to inform Coulson of his pursuits. Coulson "actively encouraged me to do it," Hoare said.

61. In response to *The New York Times* report, the British House of Commons, Home Affairs Select Committee opened parliamentary inquiries into the *News of the World*, and British

- 29 -

police announced that they would examine new evidence in connection with the phone-hacking scandal. However, despite the mounting evidence that demonstrated a widespread and pervasive pattern of conduct by *News of the World*, the newspaper denied any wrongdoing. The *News of the World* dismissed *The New York Times* report, rejecting "absolutely any suggestion there was a widespread culture of wrongdoing," and claimed that the report was "motivated by commercial rivalry."

62.     In truth, the Individual Defendants fostered a culture of lawlessness where intercepting voicemail messages to gather newsworthy information was the norm. As Paul McMullan ("McMullan"), a former senior *News of the World* journalist, acknowledged, he personally commissioned private investigators to commit several hundred unlawful acts, including phone hacking and other illegal reporting techniques. Further, senior editors were well aware of the improper practices because "reporters could not commission private investigators without going through their desk editor; because editors routinely demanded to know the source of information in stories; and because executives kept tight control of their budgets." As McMullan noted, the "illegal activity, including phone-hacking, was so widespread it [was] inconceivable senior editors did not know."

### 4.     Individual Defendants Are No Longer Able to Hide the Depth and Pervasiveness of Their Wrongdoing

63.     Though News Corp and its subsidiaries were already reeling from the ever-expanding list of phone-hacking allegations, the worst was yet to come. On April 8, 2011, News International finally acknowledged liability for its misconduct in relation to its phone-hacking activities. Citing certain unidentified "legal cases" and "justifiable claims," News International announced that they would "begin the process of bringing these cases to a fair resolution." Among those claimants that the Company offered an unreserved apology and compensation to were: (i) actress Sienna Miller who received over $162,000, including legal fees; and (ii) sports pundit Andy Gray who received $32,000, including legal fees. However, even then, the Individual Defendants sought to minimize the breadth of the phone-hacking scandal. The Company apologized to only twenty phone-hacking victims stating that News International had set up a fund of up to $33 million to compensate victims. However, the Individual Defendants

knew, and purposely omitted the fact that the hacking scandal reached far beyond these twenty victims.

64.    On July 4, 2011, the severity and magnitude of the hacking scandal would reach new heights with a report published by *The Guardian* exposing new details of phone-hacking during defendant Brooks' tenure at *News of the World*. This time, *News of the World* hacked into the voicemail of a schoolgirl, Milly Dowler ("Dowler"), who had been missing since March 2002, and was later found as a victim of a homicide. In the days following Dowler's disappearance, reporters covering the story for *News of the World* intercepted voicemail messages left on her cell phone to obtain material for their stories. When her voicemail account became full and unable to accommodate anymore messages, they deleted her voicemail messages in order to free up space for more messages. *News of the World's* actions were heinous and irresponsible as they gave false hope to her family and friends who believed that the activity on her voicemail account indicated she was alive. Worse, by deleting the voicemail messages, the British police stated that they may have lost crucial evidence as a result. In particular, *The Guardian* article stated:

> The Guardian investigation has shown that, within a very short time of Milly vanishing, News of the World journalists reacted by engaging in what was standard practice in their newsroom: they hired private investigators to get them a story.

> Their first step was simple, albeit illegal. Paperwork seen by the Guardian reveals that they paid a Hampshire private investigator, Steve Whittamore, to obtain home addresses and, where necessary, ex-directory phone numbers for any families called Dowler in the Walton area. The three addresses Whittamore found could be obtained lawfully on the electoral register. The two ex-directory numbers, however, were "blagged" illegally from British Telecom's confidential records by one of Whittamore's associates, John Gunning, who works from a base in Wiltshire. One of the ex-directory numbers was attributed by Whittamore to Milly's family home.

> Then, with the help of its own full-time private investigator, Glenn Mulcaire, the News of the World started illegally intercepting mobile phone messages. Scotland Yard is now investigating evidence that the paper hacked directly into the voicemail of the missing girl's own phone. As her friends and parents called and left messages imploring Milly to get in touch with them, the News of the World was listening and recording their every private word.

But the journalists at the News of the World then encountered a problem. Milly's voicemail box filled up and would accept no more messages. Apparently thirsty for more information from more voicemails, the paper intervened – and deleted the messages that had been left in the first few days after her disappearance. According to one source, this had a devastating effect: when her friends and family called again and discovered that her voicemail had been cleared, they concluded that this must have been done by Milly herself and, therefore, that she must still be alive. But she was not. The interference created false hope and extra agony for those who were misled by it.

The Dowler family then granted an exclusive interview to the News of the World in which they talked about their hope, quite unaware that it had been falsely kindled by the newspaper's own intervention. Sally Dowler told the paper: "If Milly walked through the door, I don't think we'd be able to speak. We'd just weep tears of joy and give her a great big hug."

The deletion of the messages also caused difficulties for the police by confusing the picture when they had few leads to pursue. It also potentially destroyed valuable evidence.

According to one senior source familiar with the Surrey police investigation: "It can happen with abduction murders that the perpetrator will leave messages, asking the missing person to get in touch, as part of their efforts at concealment. We need those messages as evidence. Anybody who destroys that evidence is seriously interfering with the course of a police investigation."

65.    Media Reports also unveiled more victims of the hacking scandal under defendant Brooks' watch.  Among those that were targeted by the Company and its subsidiaries included, inter alia, relatives of British soldiers killed in combat in Iraq and Afghanistan, relatives of victims of the July 7, 2005, London bombings, and former Prime Ministers Tony Blair and Gordon Brown.

66.    The illegal conduct perpetrated by News Corp's now be-leaguered newspaper, *News of the World*, was not simply limited to unlawful phone-hacking.  On July 6, 2011, the British Broadcasting Corporation ("BBC") released a report revealing that *News of the World* made bribe payments totaling over "tens of thousands of pounds" to the British police in exchange for information.

67.    Defendant Brooks was aware of the phone-hacking practices and illicit payment made to police officers utilized by *News of the World*.  According to a *Reuter* Special Report which interviewed four former employees of *The Sun*, "Brooks' denials are simply not credible."

Reporters would be "cross-examined for two hours every day" by Brooks "about the genesis of all the stories." Aside from the "story approval process" which required Brooks, as an editor, to vet the source of each story, Brooks' ignorance as to the phone-hacking and bribe payments were equally incredible because "budgets were so tightly controlled that payments for such services would not have gone unnoticed." As a former journalist from *The Sun* explained, "It's simply not conceivable that somebody who was editor wouldn't have known." In fact, during her testimony before parliament in March 2003, defendant Brooks brazenly admitted that the newspaper had "paid the police for information in the past."

### 5.    The Fallout

68.    Amidst the new and further damaging revelations of misconduct, the Company announced that it would close down *News of the World*. In a statement announcing the closure of *News of the World*, defendant J. Murdoch admitted that the Company "failed to get to the bottom of repeated wrongdoing that occurred without conscience or legitimate purpose." Further, J. Murdoch acknowledged that the Company made out-of-court settlements that he approved, but claimed that he "did not have a complete picture when [he] did so."

69.    The closure of *News of the World* would do little to quell the public firestorm surrounding News Corp and its subsidiaries. British Prime Minister David Cameron announced on July 8, 2011, that two inquiries had been opened to look into the phone-hacking scandal and to explore new initiatives for regulation of the British press. That same day, Coulson was arrested on suspicion of conspiring to intercept communications and public corruption. Goodman was also arrested the same day in connection with the British police investigation into illicit payments made to police.

70.    Even as the scandal threatened to engulf defendant R. Murdoch's media empire, he staunchly stood behind defendant Brooks who directly oversaw the phone-hacking and illegal payment practices while an editor at *News of the World*. As reported by *The New York Times*, when R. Murdoch was asked to identify what his chief priority was in light of the scandal, he pointed to Brooks and said, "[t]his one." In an attempt to defuse the scandal and deflect the scrutiny from Brooks and his son, J. Murdoch, defendant R. Murdoch released a statement on

July 6, 2011, repudiating the phone-hacking activities and corruption rampant under his watch as "deplorable and unacceptable." R. Murdoch assured the public that News International would "fully and proactively cooperate with the police" under "Rebekah Brooks' leadership." However, News International would have to do without defendant Brooks' leadership as she resigned from her post as the CEO of News International shortly thereafter on July 15, 2011. Two days later, Brooks was arrested on suspicion of conspiring to intercept communications and on suspicion of corruption. Despite her voluntary resignation and her complicity in the wrongdoing, the Murdochs caused the Company to pay Brooks approximately $5.6 million in severance.

71.    More resignations of executives that were at the helm during the misconduct soon followed. On July 15, 2011, defendant Hinton resigned as the CEO of Dow Jones. He was plagued by his misleading 2007 testimony to Parliament where he claimed there was "never any evidence" that the phone-hacking scandal extended beyond Goodman and Mulcaire. The Company also paid Hinton a sizable severance despite the fact that he too voluntarily resigned his position. News Corps legal department also underwent an overhaul as Lawrence Jacobs, News Corp's Corporate General Counsel, resigned in June 2011, and Crone, News International's legal manager and senior executive, left his post on July 13, 2011.

72.    The phone-hacking and corruption scandal has also forced the Company to abandon its bid to acquire full control of BSkyB. News Corp already owns 39.1% of BSkyB, and was attempting to acquire the remaining outstanding shares of the company. The takeover of BSkyB was an essential part of the Company's business strategy as it would have allowed News Corp to integrate BSkyB with its other "Sky" satellite broadcasting assets including Sky Deutschland and Sky Italia. *The Guardian* even claimed, "[w]ithout a full takeover of BSkyB, News Corp's global satellite strategy would look an unco-ordinated mess." News Corp claimed that the proposed acquisition of BSkyB would result in an increased geographic diversification of the Company's earnings base, and generate greater earnings for its newspaper business by allowing it to bundle newspaper and TV subscriptions and spread content over several media platforms. However, with Parliament poised to vote on a motion calling on News Corp to rescind its offer in light of the scandal, the Company was left with no choice but to withdraw its

bid. Moreover, News Corp is in danger of losing its stake in BSkyB, as British media regulators are evaluating the Company's fitness to operate the media enterprise or whether to seek a forced divesture.

73.     The far-reaching scandal has even touched American soil. The Federal Bureau of Investigations ("FBI") has opened an investigation into allegations that the Company intercepted voicemails and communications of the victims of the 9/11 attacks. Several U.S. lawmakers, including Senators John Rockefeller, Robert Menendez, Frank Lautenberg, and Barbara Boxer have all urged federal agencies, including the U.S. Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission ("SEC") to investigate violations of federal laws implicated by the scandal. In response, the DOJ is reportedly preparing subpoenas to issue to the Company as part of its preliminary investigation into whether *News of the World* paid bribes to British police, and whether News Corp's subsidiaries hacked into the voicemails of 9/11 victims.

74.     Despite the slew of evidence indicating otherwise, defendant R. Murdoch stated in an interview with *The Wall Street Journal* on July 14, 2011, that News Corp handled the crisis involving the phone-hacking "extremely well in every way possible" and made only "minor mistakes." Further, he defiantly added that some of the allegations against the Company's paper were "total lies." However, on July 18, 2011, the R. Murdoch changed his tone, releasing a statement that News International is "deeply sorry for the hurt suffered by the individuals affected [by the scandal]," adding "we regret not acting faster to sort things out."

75.     On July 19, 2011, defendants R. Murdoch, J. Murdoch, and Brooks gave testimony before Parliament concerning the phone-hacking and corruption scandal. In his statements, R. Murdoch attempted to distance himself from the misconduct, stressing that *News of the World* was "less than 1 percent of [the] Company," and that he "very seldom" spoke with the editors at *News of the World*. When queried as to why he did not consider resigning, R. Murdoch further deflected blame for the misconduct, stating "[b]ecause I feel that people I trusted, I'm not saying who, I don't know what level, have let me down and I think they behaved disgracefully, betrayed the company and me, and it's for them to pay,...I think that frankly, I'm the best person to clean this up."

76.     Also, during the hearing, defendant J. Murdoch admitted that he approved the settlement agreement with Taylor. However, he claimed that he was not aware of any evidence indicating that the issues at News International were more widespread in 2008. When prompted to explain payments made to Mulcaire after his conviction, J. Murdoch claimed he was not aware of such payments and could not justify their disbursals:

**Chair:** You have made that clear. Members, I am going to ask for brevity. I don't want to cut anyone off, but we have some way to go.

**Q316 Paul Farrelly:** I want to return to how John opened the session and the evidence that was given to us previously. Mr Davies omitted to ask one key question. Mr James Murdoch, through all the civil actions, have you—not you personally, but your organisation— been paying Glenn Mulcaire's legal fees?

*James Murdoch:* As I said earlier in answer to a question from Mr Davies— [Interruption.]

**Q317 Paul Farrelly:** Let's keep it short. Yes or no? It is a yes or no question.

*James Murdoch:* I do not know the current status of this. You asked the question have I paid all Mr Mulcaire's legal fees.

**Q318 Paul Farrelly:** Have you been paying legal fees for Glenn Mulcaire during the course of the civil actions?

*James Murdoch:* I don't know the details of the civil actions, but I do know that certain legal fees were paid for Mr Mulcaire by the company. I was as surprised and shocked to learn that as you are.

**Q319 Paul Farrelly:** Can you understand that people might ask why a company might wish to pay the legal fees of a convicted felon, who has been intimately involved in the destruction of your reputation, if it were not to buy his co-operation and silence?

*James Murdoch:* No, it is not. I can understand that, and that is exactly why I asked the question—when the allegations came out, I said, "How can we? Are we doing this? Is this what the company is doing?" On legal advice—again, I do not want to be legalistic; I am not a lawyer, but these are serious litigations and it is important for all of the evidence from all of the defendants to get to court at the right time. The strong advice was that, from time to time, it is important, and customary even, to pay a co-defendant's legal fees. I have to rest on counsel's advice on some of these serious litigation matters.

77.     During the hearing, J. Murdoch maintained that he was unaware of evidence indicating that any other employees besides Mulcaire and Goodman were involved in the phone

hacking activities. In particular, he disclaimed knowledge as to a key e-mail containing a transcript of one of Taylor's hacked voicemails marked "for Neville," in reference to former *News of the World* Chief Reporter, Neville Thurlbeck. This e-mail would have implicated Thurlbeck in the phone hacking scandal, and directly contradicted J. Murdoch's testimony that he was unaware of anyone else's involvement in the scandal besides Mulcaire and Goodman. However, J. Murdoch's testimony was later disputed in a joint statement issued by Crone, News International's former legal advisor, and Colin Myler, an ex-editor of *News of the World*, in which they disclosed that they informed J. Murdoch about the e-mail:

> Just by way of clarification relating to Tuesday's CMS select committee hearing, we would like to point out that James Murdoch's recollection of what he was told when agreeing to settle the Gordon Taylor litigation was mistaken.

> In fact, we did inform him of the "for Neville" e-mail which had been produced to us by Gordon Taylor's lawyers.

78.     Defendant R. Murdoch has continued to deflect blame and claim ignorance as to the illegal activities abound at New Corp's subsidiaries. As reported in a *Bloomberg* article published July 21, 2011, entitled "James Murdoch Approved Payment to Phone Tap Victim," R. Murdoch has staunchly maintained that he was not aware of the millions of dollars in settlement payments authorized by his son:

> News Corp. Chairman and CEO Rupert Murdoch has suggested he wasn't aware of any payments made to settle legal cases in which the company's newspaper reporters may have been involved in criminal activity.

> *"If that had happened, I would know about it,"* Murdoch said on July 8 in an interview at the Allen & Co. media conference in Sun Valley, Idaho.

79.     Nevertheless, the Board continues to stand behind the Murdochs and the rest of senior management despite their utter failure to investigate and prevent the massive, and yet still unfolding scandal that threatens to undermine the Company. News Corp's Board recently issued a press release affirming their support for R. Murdoch, J. Murdoch, and the "senior management team."

80.    Meanwhile, the Board has finally and belatedly resolved to initiate an investigation into the illicit news-gathering practices encumbering the Company.  However, the "Management and Standards Committee" that the Board established to address the phone-hacking allegations is structurally deficient, and unlikely to conduct a thorough and independent investigation.  To start, the committee consists of two former executives of News International, the Company's UK publishing division where the scandal took place.  Further, the committee chairman responsible for overseeing the work of the committee will report to defendant Klein, a non-independent director who is implicated in the misconduct. As Jeffrey Sonnenfeld, a professor at Yale University's School of Management said, "News Corp, led by [R. Murdoch], has structured the new 'management and standards committee' around too many insiders....There really should be outside investigators doing all of this."  As such, the public can hardly have much confidence in the Company's internal investigation as it is flawed from its inception.

B.    **News Corp's Improper Statements**

81.    As described in detail above, the Individual Defendants caused or allowed the Company and its subsidiaries to issue improper statements concerning the scope of the phone-hacking scandals and their awareness of the decade-long pattern of misconduct.  These defendants engaged in a campaign of deception to conceal the continuous and pervasive nature of the illicit practices engaged in by the Company and its subsidiaries.  These statements were improper because: (i) they mislead the public into believing that the phone-hacking scandal was isolated to certain "rogue reporters," when they knew or recklessly disregarded the fact that the phone-hacking scandal was extensive and far-reaching; (ii) they falsely represented that the Company had conducted a thorough and "rigorous" internal investigation even though they failed to uncover, or knowingly ignored mountains of evidence indicating a continuous and pervasive scheme to intercept voicemail communications of certain targeted individuals; (iii) they failed to disclose that they had entered into out-of-court settlements with victims of the phone-hacking scandal in order to conceal the breadth of the scandal; and (iv) they misrepresented that they were not aware of the widespread nature of the phone-hacking scandal and the bribes paid to British police.

82.    Defendants R. Murdoch, DeVoe, Aznar, Bancroft, Barnes, Cowley, Dinh, Eddington, Knight, J. Murdoch, L. Murdoch, Perkins, Siskind, and Thornton also made statements in News Corp's public filings that improperly represented that the Company had in place an effective system of internal controls.  In News Corp's Form 10Ks, under "Management's Report on Internal Control Over Financial Report," these defendants made substantially similar statements disclosing that the Company "maintained effective internal control over financial reporting" for the respective fiscal years.  Further, in News Corp's Form 10Qs, under "Disclosure Controls and Procedures," defendant DeVoe maintained that "the Company's disclosure controls and procedures were effective," for each respective period.  The Audit Committee Defendants reviewed and approved all of these improper statements.   However, the revelation of the continuous and pervasive phone-hacking and bribery practices employed by the Company and its subsidiaries revealed that the Individual Defendants failed to implement and maintain an effective system of internal controls over their public disclosures as they had claimed.  The following chart shows the location of the improper statement, which defendant made the improper statement, and which of the Audit Committee Defendants reviewed and approved of the improper statement:

| Date | Filing | Individual Defendants Who Signed the Filing | Audit Committee Members |
|---|---|---|---|
| 8/13/2008 | 10-K | K. Murdoch, DeVoe, Aznar, Bancroft, Barnes, Cowley, Dinh, Eddington, Knight, J. Murdoch, L. Murdoch, Perkins, Siskind, Thornton | Barnes, Eddington, Knight, Perkins |
| 11/6/2008 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 2/6/2009 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 5/7/2009 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 8/12/2009 | 10-K | K. Murdoch, DeVoe, Aznar, Bancroft, Barnes, Carey, Cowley, Dinh, Eddington, Knight, J. Murdoch, L. Murdoch, Perkins, Siskind, Thornton | Barnes, Eddington, Knight, Perkins |
| 11/5/2009 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 2/4/2010 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |

| 5/5/2010 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
|---|---|---|---|
| 8/6/2010 | 10-K | K. Murdoch, DeVoe, Aznar, Bancroft, Barnes, Carey, Cowley, Dinh, Eddington, Knight, J. Murdoch, L. Murdoch, Perkins, Siskind, Thornton | Barnes, Eddington, Knight, Perkins |
| 9/3/2010 | 10-K/A | Jacobs | Barnes, Eddington, Knight, Perkins |
| 11/4/2010 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 2/3/2011 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |
| 5/5/2011 | 10-Q | DeVoe | Barnes, Eddington, Knight, Perkins |

83.     Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft also made false and misleading statements, and material omissions in the Company's Definitive Proxies filed on Form 14A with the SEC on August 19, 2008; August 20, 2009; and August 31, 2010. These proxies all contained a substantially similar "Report of the Audit Committee" section which set forth the Audit Committee's review of the Company's internal control procedures. However, the proxies failed to disclose the material weaknesses in the Company's internal controls that allowed the Company to issue improper statements in its Annual and Interim Reports concerning the strength and efficacy of the Company's internal controls.   Further, the proxies failed to disclose that these defendants allowed the Company and its subsidiary to employ unlawful and deceptive practices. The foregoing omissions were material to the shareholder's decision to elect or re-elect these defendants to the Board. The "Report of the Audit Committee" provided in the proxies was as follows:

In accordance with its written charter, the Audit Committee assists the Board in its oversight of (i) integrity of the Company's financial statements and the Company's financial reporting processes and systems of internal control, (ii) the qualifications, independence and performance of the Company's independent registered public accounting firm and the performance of the Company's corporate auditors and corporate audit function, (iii) the Company's compliance with legal and regulatory requirements involving financial, accounting and internal control matters, (iv) investigations into complaints concerning financial matters, (v) risks that may have a significant impact on the Company's financial statements and (vi) the review, approval and ratification of transactions with related parties. The Audit Committee provides an avenue of communication among management, the independent registered public accounting firm, the

corporate auditors and the Board. Management has the primary responsibility for the preparation of the Company's financial statements and the reporting process, including the system of internal control over financial reporting. The independent registered public accounting firm has the responsibility for the audit of those financial statements and internal control over financial reporting. The Audit Committee's responsibility is to monitor and oversee these processes.

In discharging its oversight responsibility as to the audit process, the Audit Committee (i) obtained from the independent registered public accounting firm a formal written statement describing all relationships between the independent registered public accounting firm and the Company that might bear on the independent registered public accounting firm's independence consistent with Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," (ii) discussed with the independent registered public accounting firm any relationships that may impact its objectivity and independence, and (iii) considered whether the non-audit services provided to the Company by Ernst & Young LLP ("E&Y") are compatible with maintaining the accountants' independence. The Audit Committee reviewed with both the independent registered public accounting firm and the corporate auditors their identification of audit risks, audit plans and audit scope. The Audit Committee discussed with management, the independent registered public accounting firm and the corporate auditors the corporate audit function's organization, responsibilities, budget and staffing.

The Audit Committee also discussed and reviewed with the independent registered public accounting firm all communications required by generally accepted auditing standards, including those described in Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees." The Audit Committee met with each of the independent registered public accounting firm and the corporate auditors, both with management present and in private sessions without management present, to discuss and review the results of the independent registered public accounting firm's audit of the financial statements, including the independent registered public accounting firm's evaluation of the accounting principles, practices and judgments applied by management, the results of the corporate audit activities and the quality and adequacy of the Company's internal controls.

The Audit Committee discussed the interim financial information contained in each of the quarterly earnings announcements with Company management and the independent registered public accounting firm. The Audit Committee also reviewed the audited financial statements of the Company as of and for the fiscal year ended June 30, 2007 with management and the independent registered public accounting firm.

At three of its meetings during fiscal year 2008 and one meeting during fiscal year 2009, the Audit Committee met with members of management, the independent registered public accounting firm and the corporate auditors to review the fiscal 2008 certifications provided by the Chief Executive Officer and the Chief Financial Officer under the Sarbanes-Oxley Act, the respective rules and regulations of the SEC and the overall certification process. At these

meetings, management reviewed with the Committee each of the Sarbanes-Oxley Act certification requirements including whether there were any (i) significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (ii) any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

## DAMAGES

84.    News Corp has already incurred significant damages in the form of costly settlements, loss of advertisement from the Company's papers, and the closure of *News of the World*. Worse, the Individual Defendants' misconduct has caused the Company to abandon its $12 billion bid to purchase the remaining 61% stake in BSkyB, which was critical to its media integration strategy, and which would have represented the largest deal in Company history.

85.    In addition, as reflected in the Company's over $3.7 billion decline in market capitalization from the Company's share price on July 1, 2011, before the Dowler allegations were reported to the public, to July 29, 2011. News Corp has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

86.    The Company also faces damages from a securities class action brought by investors against defendants News Corp, R. Murdoch, J. Murdoch, and Brooks. Among other things, the class action complaint alleges false and misleading statements and material omissions made by the defendants concerning the Company's unlawful activities engaged in by News Corp's subsidiaries. Accordingly, the Company has and will incur costs in investigating and defending News Corp and certain officers and directors in the class action lawsuit, in addition to potentially millions of dollars in settlement or to satisfy an adverse judgment.

87.    Further, as a direct and proximate result of the Individual Defendants' misconduct, News Corp has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from responding to British authorities and U.S. federal agencies' investigations, including complying with subpoena requests, and other production of materials;

(b)    costs incurred from the internal investigation of violations of applicable rules and regulations;

(c)    costs incurred from the compensation and benefits paid to Individual Defendants who breached their fiduciary duties to the Company;

(d)    amounts paid to private investigators and agents who facilitated the interception of communications, and payments to public officials in violation of applicable anti-bribery rules and regulations;

(e)    any potential fines, sanctions, and disciplinary actions taken against the Company as a result of the illegal activities engaged in by the Individual Defendants; and

(f)    the cost of the potential settlements with the British authorities, and any other regulatory or executive agency.

88.    In addition, News Corp's business, goodwill, and reputation with its business partners, regulators, and shareholders have been severely impaired.   The outrageous and egregious nature of the phone hacking scandal has galvanized the public against News Corp as the Company has suffered, and continues to suffer, public scorn.   The Individual Defendants have rendered the Company's brand toxic, as demonstrated by their loss of media sponsorships and other business partners who cannot distance themselves from the Company at a faster pace. In addition, for at least the foreseeable future, News Corp will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that News Corp's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.    Plaintiff brings this action derivatively in the right and for the benefit of News Corp to redress injuries suffered, and to be suffered, by News Corp as a direct result of its violations of federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.   News Corp is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

90.    Plaintiff was a shareholder of News Corp at the time of the wrongs complained, has continuously been a shareholder since that time, and is a current News Corp shareholder.

91.    Plaintiff will adequately and fairly represent the interests of News Corp in enforcing and prosecuting its rights.

92.    The current Board of News Corp consists of the following sixteen defendants: R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft. Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below:

**Demand Is Excused Because Defendant R. Murdoch Dominates and Controls the Board**

93.    As explained herein, defendant R. Murdoch, and his sons, J. Murdoch and L. Murdoch, face a substantial likelihood of liability. R. Murdoch also dominates and controls the Board and will exercise his autonomy over the Board to shield his sons, especially J. Murdoch, from any liability arising from his misconduct alleged herein. Indeed, as discussed in further detail below, R. Murdoch has unfailingly manipulated the Board to accommodate him and his family members at the expense of the Company and its shareholders. Accordingly, the Board is hopelessly conflicted and incapable of exercising independent and disinterested judgment as to any demand to bring litigation against R. Murdoch or any of his sons. Demand is futile as to the entire Board.

94.    Defendant R. Murdoch, as founder, controlling shareholder, CEO, and Chairman, dictates the affairs and operations of News Corp. The Company is only one of forty-four in the Standard & Poor's 500 that divide stock into two classes, only one of which has voting power. As of April 27, 2011, R. Murdoch controlled approximately 39.7% of the voting Class B stock. In comparison, the second largest owner of News Corp voting stock merely owns 7% of the Class B stocks, and has no representation on the Board. As such, R. Murdoch has secured stranglehold on the Company's affairs, and those fiduciaries who are duty-bound to carry-out the News Corp's business operations.

95.     It is well-documented that the Board serves at the whim of R. Murdoch. In a recent article *The New York Times* published July 18, 2011, a member of the Board of GovernanceMetrics International and founder of the Corporate Library, a corporate government firm, labeled News Corp's Board as "the ultimate crony board." The same corporate watchdog group gave the News Corp board an "F" for governance "in every category," and even proclaimed that the Board "isn't just a dysfunctional board. It's a nonfunctional board." The Board consists of seven insiders, which include R. Murdoch and his two sons, two other executives that serve under him, and one of his advisors. Even of the nine directors the Board claims are independent, two are former company executives, and three directors share significant business ties to R. Murdoch. As *The New York Times* recently noted, "[t]he board of [News Corp] might as well be named 'Friends of Rupert.'"

96.     The Board has continuously and unwaveringly submitted to the wishes of defendant R. Murdoch, and extended him and his family members every privilege at the expense of the Company. For instance, at the behest of R. Murdoch, the Company and its predecessor entities have appointed both his sons to executive and directorial positions with the Company notwithstanding their individual qualifications or the propriety of such placements. In fact, J. Murdoch was brought into "the fold" at News Corp in 1996 when R. Murdoch caused the Company to purchase an 80% stake in J. Murdoch's underperforming start-up company, Rawkus Entertainment. Similarly, the Company just recently consummated a widely-criticized $674 million deal to acquire Shine Group ("Shine"), a production company founded and majority-owned by R. Murdoch's daughter, Elisabeth Murdoch ("E. Murdoch"), in order to bring her into the fold of the Company. Pursuant to the acquisition, R. Murdoch promised E. Murdoch a seat on the Board. According to an article by *The Wall Street Journal*, "A person briefed on News Corp.'s thinking said senior News Corp. managers have long considered an acquisition of Shine an 'inevitable' way to bring Ms. Murdoch to the company." In addition, R. Murdoch caused the Board to employ his wife, Wendi Murdoch, to "provide strategic advice" for the development of MySpace in China before the Company eventually sold the asset. And previously, R. Murdoch had his ex-wife appointed to the Board in 1990 despite the fact that her only prior relevant

experience was as a junior news reporter. When the couple split nine years later, R. Murdoch, again, flexed his muscle over the other directors, and simply kicked her off the Board.

97.    Investors have even coined the term, the "Murdoch discount," to valuate News Corp stock. The "Murdoch discount" takes into account R. Murdoch's unfettered penchant for indulging in his personal interests to expand his media empire by entering into dilutive transactions rubberstamped by the Board notwithstanding shareholder value. News Corp's recent transactions validate the "Murdoch discount." For instance, in 2007, News Corp acquired Dow Jones for $5 billion which represented a staggering 70% premium to Dow Jones' profits. It was no secret that the widely-criticized Dow Jones purchase was primarily consummated to satisfy R. Murdoch's appetite for ownership of *The Wall Street Journal*, which he sought to use to further his personal political agenda. Only two years later, the Company was forced to write down $2.8 billion of the value of Dow Jones, comprising nearly half of the acquisition price it paid.

98.    Unsurprisingly, the Board has pledged unwavering support for R. Murdoch and senior management as fresh details of the phone-hacking scandal and corruptive payments are released almost daily. While the phone-hacking crisis was unfolding, the Board failed to even demand an investigation into or resignation of defendants Brooks and Hinton, who were at the helm of News International and *News of the World* through the duration of the misconduct, in fear of upsetting R. Murdoch, who shares a close personal relationship with both Brooks and Hinton. An article in *The New York Times* highlighted the Board's reticence to act in the face of the still unfolding crisis, reporting "[n]ot one [Board member] has publicly called for the resignation of top officials at the company. And not one has pushed for an outside investigation, although the company has started its own." As such, the Board has proven it is incapable of rendering independent judgment and will not act independently because they are beholden to R. Murdoch for their positions with the Company and the lucrative compensation they receive thereof.

99.    As the Company's proxy statement filed August 31 2010, candidly admits, seven of the sixteen Board members, namely defendants R. Murdoch, J. Murdoch, L. Murdoch, Carey, DeVoe, Klein, and Siskind are not independent directors.

100.    Defendants J. Murdoch and L. Murdoch, as the sons of R. Murdoch, share a close familial relationship with their father that prevents them from exercising any independent or disinterested judgment as to a demand to pursue litigation against him. R. Murdoch was single-handedly responsible for bringing J. Murdoch and L. Murdoch into the family business, and appointing them to major operational positions within News Corp. Indeed, both J. Murdoch and L. Murdoch are beholden to their father for the lucrative compensations they receive from their positions with the Company. In their positions at News Corp, J. Murdoch and L. Murdoch received approximately $10.3 million and $1.7 million, respectively in 2010. Because they owe their entire livelihood to their father, J. Murdoch and L. Murdoch would not dare cross R. Murdoch and risk being ostracized personally and professionally from the good graces of their father. Moreover, as brothers that share both a personal and professional relationship, J. Murdoch and L. Murdoch share a close kinship that prevents each of them from independently evaluating a demand to bring litigation against the other. Accordingly, J. Murdoch and R. Murdoch are hopelessly conflicted and unable to render impartial judgment as to any litigation demand. Demand upon them is futile.

101.    Defendant Carey is neither independent nor disinterested. As R. Murdoch's hand-selected President and COO, Carey receives an annual salary of approximately $8.1 million, not including his other remunerations which brings his total executive compensation to a whopping $26 million. Not to mention, as Deputy Chairman of the Board, he received over $960,000 as a result of a change in pension value and non-disqualified compensation earnings. Carey's relationship with R. Murdoch extends back to 1988 when he first joined the Company, and the multiple roles he served with News Corp, and other entities affiliated with R. Murdoch including Sky Deutschland AG, DirecTV, and BSkyB. R. Murdoch has, himself, acknowledged that Carey has been "one of [his] closest advisers and friends for years." Because Carey shares a close personal and professional relationship with R. Murdoch, and he is beholden to R. Murdoch for his livelihood, Carey cannot impartially evaluate any potential demand to institute litigation against him. Demand is futile as to Carey.

102.    Defendants DeVoe and Siskind are similarly beholden to R. Murdoch due to their current positions and principal occupations in an entity controlled by R. Murdoch. DeVoe and Siskind have served on the Board and as an executive at News Corp for over twenty years and have been well-compensated during their tenure. Since 2007, DeVoe enjoyed a base salary of approximately $2.9 million, and in 2006 alone, DeVoe's total executive compensation was approximately $12.7 million, which included a bonus of $6.2 million. In 2005 alone, Siskind amassed over $6.7 million in executive compensation, and over $3.7 million in director compensation. DeVoe and Siskind also both have sons that obtain great pecuniary gain through their relationship with News Corp. DeVoe's son, David F. DeVoe, Jr., is the Deputy CFO and Executive Vice President of Fox Entertainment Group, Inc., which is a subsidiary of News Corp. Siskind's son, Kenneth M. Siskind, is a Managing Director of Allen & Company LLC ("Allen & Company"), an investment bank that provided investment advice to the Company during fiscal year 2009. For its services Allen & Company was paid approximately $17.5 million. Accordingly, because of their respective lucrative compensation, extensive relationships with R. Murdoch, and their vested interest in preserving their sons' financially beneficial relationships with New Corp, DeVoe and Siskind cannot exercise independent or disinterested judgment as to any demand to institute litigation against R. Murdoch. Demand upon them is futile.

103.    Defendant Klein is not independent or disinterested. Klein's director compensation exceeds $250,000 annually, and as a News Corp executive, Klein receives $2 million a year, not including his $1 million signing bonus. Defendant Klein's compensation and livelihood is inextricably tied to his position with the Company as it represents his principal source of income. He is beholden to defendant R. Murdoch for his continued employment and substantial remunerations, and is hopelessly conflicted and incapable of exercising independent and disinterested judgment as to any demand to bring litigation against those responsible for his primary source of income. Demand is futile upon Klein.

104.    Defendant Eddington is not independent or disinterested. In addition to the over $400,000 in compensation he receives annually for his services as a director of the Board, Eddington is the Non-Executive Chairman of JPMorgan Chase & Co. ("J.P. Morgan") in

Australia and New Zealand, and possesses conflicts that arise from J.P. Morgan's significant business dealings with News Corp. For instance, with regard to the highly-controversial Shine transaction, J.P. Morgan served as the financial advisor to Shine, which was majority-owned by R. Murdoch's daughter, E. Murdoch. Further, a J.P. Morgan affiliate acted as the financial adviser to News Corp in its recently withdrawn bid to acquire BSkyB, which would have been the largest acquisition ever for the Company. In February 2011, J.P. Morgan was also retained to serve as the sole book-runner for the $2.5 billion debt offering by News America Inc., a subsidiary of News Corp. Currently, J.P. Morgan is advising News Corp in its bid to purchase Formula One motor racing.

105.    Eddington has also served on the Board of News Corp's subsidiaries and entities majority owned by the Company. He served as a Director of News Limited, News Corp's principal subsidiary in Australia, from 1998 until 2000. Eddington also was the Chairman of Ansett Holdings Limited and a Director of Ansett Australia Limited and Ansett Australia Holdings Limited from 1997 until 2000. Ansett Australia was an asset of News Corp until 2000, and it was a wholly owned subsidiary of Ansett Holdings Limited, which was equally owned by Air New Zealand and News Corp. A prime example of Murdoch's influence over Eddington and the Board is demonstrated in Eddington's response to a shareholder question during News Corp's 2010 annual shareholder meeting. In response to questions concerning whether the Board and the Audit Committee considered the reputational risks associated with the Company's $2 million donation to entities promoting Republican Party interests, Eddington responded: "As I said, the board takes advice from the management team and considers it on that basis, and also refers it to the company's general counsel, and on that basis the donations are made." As such, because of Eddington's significant director compensation and extensive professional relationship with R. Murdoch, he cannot possibly evaluate independently and in a disinterested manner any potential demand to institute litigation against R. Murdoch. Demand is futile as to Eddington.

106.    Defendant Knight has served on the Board since 1991. Since at least 2002, he's earned over $1.5 million for his services on the Board. Knight also has been the Chairman of J. Rothschild Capital Management Limited since 2008, and have served as a director of Rothschild

Investment Trust Capital Partners plc from 1997 to 2008. Jacob Rothschild, who is the Chairman of Rothschild Investment Trust Capital Partners plc, bought an equity stake in Genie Oil and Gas Inc. with R. Murdoch, and both has served on Genie Energy's Strategic Advisory Board. Knight and R. Murdoch's association with the Rothschild entities shows the continuous professional relationship shared by the two even outside of News Corp. In fact, in the 1990's R. Murdoch went as far as to name Knight his "backstop and successor." Knight cannot exercise independent and disinterested judgment as to any demand to institute litigation against R. Murdoch due to Knight's over two decades of service on the Board with R. Murdoch, his material compensation received as a director, and his ongoing professional and personal relationship with R. Murdoch. Demand is futile as to Knight.

107.    Defendant Bancroft has been a director since 2007, and has received over $400,000 in compensation for her role on the Board in the last two years. According to the Company proxies, Bancroft is a professional ballet dancer and an aspiring opera singer. In conjunction with the sale of Dow Jones to News Corp in 2007, the Bancroft family sought representation on the Board. R. Murdoch hand-picked Bancroft, who was only twenty-seven at the time and had no journalism or business experience, to appease the Bancroft family and ensure that the new appointee would not challenge R. Murdoch's control of the Board. Reportedly, R. Murdoch "simply handed the job to Natalie [Bancroft]" without interviewing any of the other Bancroft family's nominees for the position. Accordingly, because Bancroft is beholden to R. Murdoch for her position on the Board and the compensation received thereof, she cannot impartially evaluate any demand to institute litigation against R. Murdoch. Further, Bancroft's relative lack of business experience renders it unlikely that she will challenge R. Murdoch's autonomy over the Board and objectively consider a litigation demand. Therefore, demand is futile upon Bancroft.

108.    Defendant Cowley serves as the head of the Murdoch family trust, and thus owes Murdoch's children financial and fiduciary responsibilities. Cowley has been a director since 1979, and has received well over a million dollars in compensation for his services on the Board since 2002. From 1964 to 1997, Cowley also served as a senior executive of News Limited, a

News Corp subsidiary. He is beholden to R. Murdoch for his over three decades of service at News Corp as both a director and officer, and he is hopelessly incapable of exercising independent and disinterested judgment on a litigation demand as to R. Murdoch.

109.    Defendant Aznar is a long-time friend of R. Murdoch, and they had been friends for several years before R. Murdoch brought Aznar into the Board in 2006. Indeed, R. Murdoch even attended the wedding of Aznar's daughter in 2002. Prior to his Board membership, Aznar also provided consulting services for R. Murdoch. As a Board member, Aznar has received over $650,000 since 2007 in compensation and stock awards. As such, Aznar cannot evaluate any demand to bring litigation against R. Murdoch in an independent and disinterested fashion. Demand is futile upon Aznar.

110.    Defendant Dinh also shares a close and personal relationship with the Murdoch family that extends beyond Dinh's service on the News Corp Board. Dinh and L. Murdoch have forged a tight-knit friendship since they met in June 2003 at the Aspen Institute conference on journalism and homeland security. However, Dinh's ties to the Murdoch family extend almost two decades to 1992, when one of Murdoch's enterprises, the South China Morning Post, helped Dinh free his sister from a Hong Kong refugee camp. In fact, Dinh has traveled to Australia for L. Murdoch's wedding, and is the godfather of L. Murdoch's child. As a Board member since 2004, Dinh has received over a million dollars in compensation. Because of Dinh's close personal relationship with the Murdoch family, the Murdochs' assistance in freeing his sister from a refugee camp, and the material compensation he receives as a Company director, he cannot evaluate any demand to bring litigation against R. Murdoch or any of his sons in an independent and disinterested manner. Demand is futile as to Dinh.

## Demand Is Excused as to the Entire Board Because They Face a Substantial Likelihood of Liability

111.    Demand is futile as to defendant J. Murdoch because he knowingly, recklessly, or with gross negligence authorized the use of illicit, deceptive, and corruptive practices by News Corp's subsidiaries to obtain newsworthy information for publication in its newspapers. These practices spanned close to a decade, and J. Murdoch knew that News International and its

subsidiary *News of the World* were engaging in these unlawful activities. In fact, J. Murdoch admitted authorizing the settlement payments to phone-hacking victims in exchange for their silence in order to conceal the widespread nature of the misconduct. In furtherance of his scheme to cover-up the Company's unlawful practices, J. Murdoch made improper statements claiming the illicit practices were isolated to a couple of "rogue" reporters. Accordingly, J. Murdoch breached his fiduciary duties and faces a substantial likelihood of liability. Demand is futile as to J. Murdoch.

112.    As the CEO, Chairman, and controlling shareholder of News Corp, R. Murdoch was responsible for managing the business operations of the Company, and apprising himself of the material events of News Corp and its subsidiaries. Instead, in a direct breach and dereliction of his fiduciary duties, R. Murdoch, either affirmatively sanctioned the illegal activities taking place at News Corp's newspapers that occurred at least since 2002, or willfully or with gross negligence ignored these illegalities which were publicized as early as 2005. Incredibly, R. Murdoch claimed he was unaware of the illegal activities being perpetrated by his subsidiaries or any out-of-court settlements paid by the Company. However, these statements were preposterous given *News of the World's* illegal phone-hacking activities were publicly reported since 2005, and his son J. Murdoch personally authorized the settlement payments to conceal the misconduct. Even if R. Murdoch was ignorant as to the continuous and pervasive misconduct that was being perpetrated under his watch, R. Murdoch still breached his fiduciary duties by failing to exercise proper oversight or supervision over News International or News Corp's newspapers. Because defendant R. Murdoch faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty and care, demand upon him is futile.

113.    Defendants R. Murdoch, J. Murdoch, Carey, DeVoe, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft breached their fiduciary duty of loyalty by allowing the Company and its subsidiaries to engage in unlawful and corruptive practices, and failing to implement and maintain an adequate system of internal controls to prevent the foregoing illicit practices. Worse, defendants R. Murdoch, J. Murdoch, Carey, DeVoe, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins,

Barnes, Dinh, Thornton, Aznar, and Bancroft made improper statements in the Company's filings representing that it had in place an effective system of internal controls. As alleged herein, these defendants were fully aware of the phone-hacking and illicit payments that were rampant in News International and *News of the World*. Nevertheless, instead of conducting a thorough investigation to rid the Company of these illegal practices, these Board members allowed the unlawful activities to continue. They mislead investors and the public-at-large by allowing the Company and its subsidiaries to issue statements insisting these practices were isolated incidents attributed to a couple of "rogue" reporters. Indeed, these Board members actively sought to conceal the severity and magnitude of their wrongdoings by authorizing the Company's subsidiaries to make out-of-court payments to victims of their misconduct in exchange for their silence. The Board's conduct was especially egregious because even when the widespread nature of the phone-hacking and corrupt payments were revealed, they failed to take timely corrective measures to hold those responsible accountable for their actions, and call for an independent investigation into the matter. As a result, the Company's image and reputation has been devastated, and it faces a myriad of lawsuits and government investigations on both sides of the Atlantic. Moreover, the Company's hopes of acquiring BSkyB, and integrating it with its other broadcasting assets have been effectively destroyed in light of the staunch political opposition to News Corp's expansion efforts. Accordingly, defendants R. Murdoch, J. Murdoch, Carey, DeVoe, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft breached their fiduciary duties, and face a substantial likelihood of liability. Demand upon them is futile.

114. Defendants R. Murdoch, J. Murdoch, Carey, DeVoe, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft knowingly, recklessly, or at least negligently caused to be issued and participated in the issuance of the Company's August 19, 2008; August 20, 2009; and August 31, 2010 proxies. The proxies contained a proposal to News Corp's shareholders that they vote to elect or reelect these defendants to hold office during their respective periods. The proxies, however, misrepresented and failed to disclose that R. Murdoch, J. Murdoch, Carey, DeVoe, Eddington, Cowley, Knight,

Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft had caused News Corp and other Individual Defendants to misrepresent the strength and efficacy of the Company's internal controls, and allowed the Company and its subsidiaries to engage in unlawful practices. The truth concerning the Individual Defendants' misleading statements was not fully revealed until after News Corp and its subsidiaries' illicit practices came to light. Thus, these defendants caused News Corp to violate section 14(a) of the Exchange Act. Accordingly, defendants R. Murdoch, J. Murdoch, Carey, DeVoe, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft face a sufficiently substantial threat of liability for their breach of fiduciary duties in causing News Corp to violate federal law and any demand upon them is futile.

115.    Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft as members of the Board, were and are subject to the SBC. The SBC went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The SBC required that these defendants preserve the Company's "most valuable asset" – its reputation. In particular, the SBC expressly required that these defendants refrain from doing "anything that would harm that reputation, or that would otherwise bring the Company into disrepute." Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft failed to do this which violated the SBC. Because these defendants violated the SBC and failed to maintain the Company's reputation, they face a substantial likelihood of liability for breaching their fiduciary duties, and demand upon them is futile.

116.    Defendants Barnes, Eddington, Knight, and Perkins were members of the Audit Committee. As members of the Audit Committee during the relevant period, these Audit Committee Defendants had additional and heightened responsibility to oversee the Company's compliance with legal and regulatory requirements, and ensure the "integrity of the Company's financial statements and the Company's financial reporting processes and systems of internal control." Thus, the Audit Committee Defendants were responsible for ensuring that the

Company had an adequate system of internal controls in place to ensure compliance with applicable rules and regulations. The Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they knowingly and recklessly failed to ensure such internal controls were in place as demonstrated by the illicit phone-hacking and bribery of public officials that occurred under their watch. Further, they allowed the Company to disseminate improper statements that it had an effective system of internal controls. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

117. Defendants Perkins and Dinh share a personal and professional relationship that arises from Dinh's legal representation of Perkins in 2006 in connection with a scandal at the Hewlett-Packard Company ("Hewlett-Packard") involving its illegal-accessing of directors' phone records. In fact, Perkins resigned from the Board of Hewlett-Packard because of a similar phone hacking scandal, and therefore was aware of the need to implement sufficient internal controls to detect and prevent the same course of conduct. According to media reports, Perkins and Dinh met at a June 2006 dinner welcoming then - Spanish President Anzar to the News Corp Board. According to Dinh, "[b]etween drinks and glimpses at a World Cup match...Mr. Perkins asked me for advice on a confidential matter." Dinh and Perkins also discussed the Hewlett-Packard scandal "later that night and on the plane the next day.... Mr. Perkins asked [Dinh] to serve as his counsel, and [he] agreed." Their personal and professional relationship serving on News Corp's Board and their attorney-client relationship prevents them from acting independently of another. Further, Perkins faces a substantial likelihood of liability due to his heightened sensitivity to the nature of the misconduct that parallels the Hewlett-Packard phone hacking scandal, and his ensuing failure to implement and maintain sufficient internal controls. Demand is futile as to Perkins and Dinh.

118. Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft as members of the Board, have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites

derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Likewise, defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft have received and will continue to receive substantial compensation predicated upon News Corp's business results. The acts complained of herein have resulted in economic benefits to News Corp (as well as to these defendants through their increased and continuing compensation) without corresponding recognition or accounting for the correlated liability and risk that News Corp was subject to as a result of these schemes. Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into News Corp's 's balance sheet. Thus, demand on defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft is futile, and therefore, excused.

119.    If defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft are protected against personal liability for their acts of mismanagement and breach of fiduciary duties alleged in this Complaint by officer and directors' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of News Corp. However, the officer and directors' liability insurance policies covering defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft in this case contain provisions that eliminate coverage for any action brought directly by News Corp against the defendants, known as the "insured versus insured exclusion." As a result, if the Board were to cause News Corp to sue themselves or certain of the officers of News Corp, there would be no officer and directors' insurance protection and thus, this is a further reason why defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley,

Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no officer and directors' liability insurance, then defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft will not cause News Corp to sue themselves, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

120. News Corp has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet News Corp's Board has not filed any lawsuits against defendants or others who were responsible for the wrongful conduct to attempt to recover for News Corp any part of the damages News Corp suffered and will suffer thereby. Thus, demand on the Board is futile, and therefore, excused.

121. Moreover, despite the Board having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for News Corp for any of the wrongdoing alleged by plaintiff herein.

122. Plaintiff has not made any demand on the other shareholders of News Corp to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) News Corp is a publicly held company with over 798 million shares outstanding as of April 27, 2011, and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**For Violation of Section 14(a) of the Exchange Act Against Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft**

123.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.   Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's proxies issued on August 19, 2008; August 20, 2009; and August 31, 2010. The proxies contained a proposal to News Corp's shareholders that they vote to elect or reelect these defendants to hold office during their respective periods. The proxies, however, misrepresented and failed to disclose that these defendants had caused News Corp and other Individual Defendants to misrepresent the strength and efficacy of the Company's internal controls, and allowed the Company and its subsidiaries to engage in unlawful practices. The truth concerning the Individual Defendants' misleading statements was not fully revealed until after News Corp and its subsidiaries' illicit practices came to light. By reasons of the conduct alleged herein, these defendants, who caused the issuance of the proxies, violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, News Corp misled and/or deceived its shareholders by falsely portraying the qualifications and integrity of these defendants.

125.   Plaintiff, on behalf of News Corp, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of the defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of News Corp, also seeks to void the election of defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of News Corp, and because of their ability to control the business and corporate affairs of News Corp, owed News Corp fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage News Corp in a fair, just, honest, and equitable manner.

128.    Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Siskind, Hinton, and Brooks, as officers of the Company, owed News Corp the highest duty of care and loyalty. These defendants breached their duties of loyalty and care by knowingly, recklessly, or with gross negligence causing or allowing the Company, through its subsidiaries, to engage in improper business practices, including unlawfully intercepting voicemail message and paying bribes to public officials for information. These officer defendants also knowingly, recklessly, or with gross negligence failed to conduct their business and operations without establishing and maintaining a system of internal controls to detect and prevent these illicit activities. In order to conceal their misconduct, the officer defendants knowingly, recklessly, or with gross negligence made or caused the Company to issue improper statements concerning the true extent and nature of the unlawful practices alleged herein.

129.    Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft as directors of the Company, owed News Corp the highest duty of care and loyalty. These directors defendants breached their duty of loyalty and care by knowingly or recklessly allowing the Company, through its subsidiaries, to engage in the unlawful news gathering practices alleged herein, and failing to conduct its business and operations without establishing and maintaining a system of internal controls to detect or prevent these illicit practices. The director defendants also allowed the Company to issue improper statements that effectively concealed the true extent and nature of the phone-hacking scandal and bribe payments made to public officials.

130.    As a direct and proximate result of defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

131.    Plaintiff, on behalf of News Corp, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Waste of Corporate Assets

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    As a result of the misconduct described above, defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft, Hinton, and Brooks wasted corporate assets by: (i) making illicit payments to public officials for information; (ii) making improper payments to private investigators to hack into the phones of certain targeted individuals; (iii) paying costly out-of-court settlements and legal fees to phone-hacking victims, and specifically Goodman and Mulcaire, to conceal the Individual Defendants' misconduct; (iv) failing to properly consider the interests of the Company and its public shareholders; (v) failing to conduct proper supervision; (vi) paying bonuses to themselves; (vii) providing Brooks with her multimillion dollar severance package, despite resigning in disgrace and subsequently arrested for watching over the phone hacking at *News of the World*; and (vii) causing the Company to incur millions of dollars of legal liability and/or legal costs to defend their unlawful actions and cooperate with pending government investigations.

134.    As a result of the waste of corporate assets, defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks are liable to the Company.

135.    Plaintiff, on behalf of News Corp, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    By their wrongful acts and omissions, defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks were unjustly enriched at the expense of and to the detriment of News Corp.  Defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to News Corp.

138.    Plaintiff, as a shareholder and representative of News Corp, seeks restitution from defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants from their wrongful conduct and fiduciary breaches.

139.    Plaintiff, on behalf of News Corp, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of News Corp, demands judgment as follows:

A.    Against defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Klein, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, Bancroft, Hinton, and Brooks and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of federal securities laws, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Voiding the election of defendants R. Murdoch, Carey, DeVoe, J. Murdoch, Eddington, Cowley, Knight, Siskind, L. Murdoch, Perkins, Barnes, Dinh, Thornton, Aznar, and Bancroft because it was the result of a materially misleading proxy in violation of federal securities laws;

C.     Directing News Corp to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect News Corp and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's internal controls as to its compliance with applicable federal, state, and foreign laws and regulations proscribing illegal news-gathering practices such as phone-hacking and bribery;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.     a provision to permit the shareholders of News Corp to nominate at least three candidates for election to the Board; and

4.     a proposal to strengthen News Corp's corporate governance to ensure independence of the Board from management by separating the roles of Chairman of the Board from the CEO position;

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of News Corp has an effective remedy;

E.     Awarding to News Corp restitution from defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountant and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 10, 2011

LAW OFFICES OF THOMAS G. AMON

Thomas 6. Amon

THOMAS G. AMON

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-242730

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Lane, Suite A
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774

Attorneys for Plaintiff

635974

## VERIFICATION

I, Christina Carroll, hereby declare as follows:

I am counsel for Iron Workers Mid-South Pension Fund, a shareholder of News Corporation. Iron Workers Mid-South Pension Fund has been a shareholder continuously since June 22, 2007. I have read the foregoing Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and violation of the Securities Exchange Act of 1934 and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _8/7/11_

_Christina L Carroll_
CHRISTINA CARROLL